**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF WISCONSIN**

---

**In re:**

**FIRST PHOENIX-WESTON, LLC,** *et al.,*[1]   **Case No. 16-12820-cjf**
                                            **Chapter 11**
  **Debtors.**                              **Jointly Administered**

---

**SABRA PHOENIX WISCONSIN, LLC'S POST-TRIAL BRIEF
IN SUPPORT OF MOTION FOR ENTRY OF ORDER
ESTIMATING CLAIM FOR BREACH OF OPTION AGREEMENT**

---

Sabra Phoenix Wisconsin, LLC ("Sabra"), by its attorneys at Husch Blackwell LLP, submits this post-trial brief in support of its Motion for Entry of Order Estimating Claim for Breach of Option Agreement [Dkt. No. 307] (the "Estimation Motion").

## ARGUMENT

**I.    THE EVIDENCE SHOWS THAT THIS CASE IS NOT BARR V. GRANAHAN.**

This case is not *Barr v. Granahan*, 255 Wis. 192, 38 N.W.2d 705 (Wis. 1949). In its prior brief, Sabra demonstrated how the transaction at issue in *Barr* was fundamentally different from the transactions at issue here. The evidence admitted at the estimation hearing proves it:

- Unlike *Barr*, this case does not involve a traditional loan and mortgage with an option attached; it involves one in a series of development agreements with multiple components all designed with one primary result in mind, agreed to by both parties: Sabra would acquire the Facility once it stabilized (whether by exercising the Option or by Weston exercising its put), and Sabra would lease the property back to Weston following the acquisition. (*Transcript of Objection to Claim 16 and Motion Hearing held before the Honorable Catherine J. Furay, April 26, 2017* (hereinafter "Transcript") at 46-51, 53-54, 71). Mr. Castleberg, who was not involved in the negotiation of these documents (Transcript at 99), cannot (after the fact) attempt to change the parties' relationship into a traditional loan and mortgage where the option is nothing more than security for the loan.

- Unlike *Barr*, the Purchase Price was to be calculated using an agreed mathematical formula that is specifically tailored to a sale/leaseback scenario. (Transcript at 76-78.)

---

[1] Jointly administered with *In re: FPG & LCD, L.L.C.,* Case No. 16-12821-cjf.

MIL-28505616-4

- Unlike *Barr*, there is no possible "clogging" of redemption rights because there was "no value to the option once [Sabra] accelerated the loan." (Transcript at 72.) The entire purpose of the Option was to have it triggered upon "Stabilization." (Transcript at 63-64.) It was not triggered upon an event of default. (Transcript at 75.) Sabra does not seek specific performance.

- Unlike *Barr*, the Option Agreement was not executed solely in consideration of the loan being made. The Option Agreement granted a valuable put right to Weston (Transcript at 54, 63), and both the Option and the put were required by the Pipeline Agreement, which established the development framework discussed above. (Transcript at 57-58.) Weston was not obligated to obtain a loan from Sabra, but when it elected to do so, that loan came with a pre-existing obligation to exchange option rights for put rights. (Transcript at 56-58.)

For all of these reasons, and those set forth in Sabra's prior brief, the Court should reject Debtors' attempts to equate this case with *Barr*.

## II. THE EVIDENCE AND THE LAW SHOW THAT THE OPTION AGREEMENT DID NOT AUTOMATICALLY TERMINATE OR "LAPSE" WHEN THE CLOSING DID NOT OCCUR.

The only provision in the Option Agreement that addresses the possibility of a delayed closing provides that, in the event the contractual conditions precedent have not been satisfied or waived by Sabra before the closing, Sabra "may elect, by delivery of a written notice to [Weston], to not purchase the Facility, in which event the Call Option and Put Option shall be automatically terminated and of no further force or effect." (Sabra Ex. 14, § 5(a).) There is no dispute that Sabra never exercised this right, and never delivered such a written notice. (Transcript at 95:6-14.)

Without such a provision to rely on, and (more important) without having provided any notice of intent to rescind (Transcript at 94:24-25, 95:1-5), Weston asks the Court to find that the Option Agreement automatically terminated or "lapsed" when the closing did not occur. Sensibly, this is not the law.

Start with the obvious: the Option Agreement does not include a clause that provides for automatic termination in the event of a delayed closing. (Sabra Ex. # 14.) It might have said that

2

the contract was "null and void" if the closing did not timely occur, but it does not. In fact, the only expression of intent on this point, § 5(a), reveals that the contract would only be cancelled if Sabra *elected* to not purchase the Facility *by delivering a notice* to that effect. (Sabra Ex. 14, § 5(a).) The parties never intended an automatic rescission "trigger" on the closing date.

Even if time were of the essence, Weston still had to provide notice of rescission if it believed it had a right to do so. *See, e.g., M & I Marshall & Ilsley Bank v. Pump*, 88 Wis. 2d 323, 331, 276 N.W. 2d 295, 298-99 (Wis. 1979). In *M & I*, the Wisconsin Supreme Court reiterated this general rule:

> If a party means to rescind a contract because of the failure of the other party to perform it, he should give a clear notice of his intention to do so; and where time is not of the essence of the contract he must give the other party a reasonable time thereafter to comply, unless the contract itself dispenses with such notice or unless notice becomes unnecessary by reason of the conduct of the parties. However, notice of intention to rescind is necessary only where the party has merely delayed performance, and not where he has abandoned the contract, or treated it as terminated, or where he has refused to perform; nor does the rule apply where fraud in the procurement of the contract is alleged.

*Id.* at 298-99 (citing 17A *C.J.S. Contracts* § 435 (1963)). *See also Guenter v. Gnagi*, 258 Wis. 383, 392, 46 N.W.2d 194, 197-98 (Wis. 1951) (emphasis added):

> Even where time is made the essence of the contract, this provision may be waived by the party for whose benefit or protection it is inserted, either expressly or by extending the time for payment or performance or by granting indulgence to the other party in this regard; and when such a waiver has been made, *he cannot arbitrarily and summarily declare a forfeiture of the contract for delay*, but must first demand payment or performance and give the other party a reasonable time and opportunity, after such demand, to comply.

Several observations flow from these rules. First, even if time were of the essence, Weston waived the right to rely on the delay by failing to take action after the closing for a period of some seven weeks and subsequently filing for bankruptcy protection. At a minimum,

MIL-28505616-4

Weston's delay "granted indulgence" to Sabra in this regard, so Weston had to demand performance or declare the real estate contract rescinded if it wanted to avoid liability.

Second, the contract did not "dispense with" notice; the only relevant language specifically contemplates written notice. Third, notice to Sabra did not become unnecessary here by reason of any conduct on the part of the parties. Weston can point to no evidence on this point, and the testimony clearly shows that Sabra made repeated efforts to proceed to a closing with Weston. (Transcript at 85-86; 87:15-23; 88:2-10; 88-89; 90:16-22; 92:6-14; 125:7-12.) Fourth, there is no evidence that Sabra abandoned (or treated as terminated) the Option Agreement. Instead, the undisputed evidence shows that Sabra affirmed the Option Agreement by filing a claim for money damages before the deadline for doing so expired.

Fifth, there is no evidence that Sabra refused to perform the Option Agreement; Ms. Nevo-Hacohen's testimony shows that Sabra was ready, willing and able to perform as long as the conditions precedent were met. (Transcript at 94:19-23.) (And as for Weston, the only evidence available shows that Weston was not ready, willing or able to close by the extended closing date.) (Transcript at 94:15-18; 92:15-25; 125:4-12) ("[Weston was] refusing to actually perform even the most basic tasks associated with getting to a closing, and they . . . essentially stymied closing.") And finally, there is no evidence or argument that there was fraud in the procurement of the Option Agreement. Under these circumstances, the Court should conclude that Sabra is entitled to pursue a claim for damages under the Option Agreement.

Case law aside, consider the inherent problem with the rule proposed by Weston. If a contract like the Option Agreement automatically terminates or is rescinded when a closing does not timely occur, what is the deadline by which a party in Sabra's position should be expected to bring a claim for damages before it loses that right for having "slept" on it? Should Sabra have

been expected to sue for damages *before* the extended closing date? On the day of the closing, or perhaps one week, or one month thereafter?

The Court should not tinker with a party's deadline to sue for damages arising from breach of contract because Wisconsin law already provides such a deadline: six years. *See* Wis. Stat. § 893.43. To the extent that Weston's argument can be interpreted as one for laches, Weston failed to introduce any evidence to support such a claim. *See, e.g., Haferman v. St. Clare Healthcare Foundation, Inc.*, 2005 WI 171, ¶ 60, 286 Wis. 2d 621, 707 N.W.2d 853 (reciting elements of laches). In the end, Weston had an easy way to address its perceived problem: send a letter to Sabra demanding performance by a date certain with a threat of rescission if performance is not rendered. Or more aggressively, send a letter to Sabra arguing that time was of the essence and providing notice of immediate rescission. Weston did neither, so it cannot now complain that Sabra is suing for damages. (Transcript at 94:24-25, 95:1-5.)

### III. THE EVIDENCE SHOWS THAT WESTON NEVER REVOKED THE OPTION OR RESCINDED THE FULLY MATURED REAL ESTATE CONTRACT.

For all the talk of consideration and failure to close, Weston has never explained or even acknowledged its failures to revoke the Option or rescind the fully matured real estate contract that followed. There *was* consideration at the Option stage (Sabra gave Weston a valuable put right) and at the time the Call Option Period was extended (Sabra gave Weston much-needed time to improve the performance of the businesses) (Transcript at 53:10-16; 63:5-18; 66:8-11), but once again, consideration at these early stages would only matter if Weston had sought to revoke its continuing offer to sell. The undisputed testimony shows that Weston never did that, so even if consideration were lacking before Sabra exercised the Option, it would not affect Weston's liability for damages. (Transcript at 79:24-25, 80:1-2.)

In its Reply Brief, Weston argues that there was no consideration for the fully matured real estate contract, but this is wrong as a matter of law. *St. Norbert College Foundation, Inc .v. McCormick*, 81 Wis. 2d 423, 260 N.W.2d 776 (Wis. 1978), cited in Sabra's opening brief, demonstrates as much. Weston wrongly claims that the college had paid $5,000 annually to the defendant in that case in exchange for 7,000 shares of stock. In fact, for the second buy-sell agreement at issue, the sale and the payments were to take place in the future, but never actually occurred. *See id.* at 427-29 ("On either October 7th or 8th, 1965, both the trust and the second buy-sell agreement were executed. . . . The sale was to take place on January 2, 1971.") The Supreme Court held that consideration existed not because payment had already been made (it had not), but because the parties had promised to buy and sell in the future. *See id.* at 430 ("However, the presence of consideration *is clear from the document*. Plaintiff agreed to pay the stipulated price $5,000 per year for life to the defendant.") (emphasis added). The Supreme Court never examined whether money had actually changed hands.

Under Wisconsin law, the promises themselves, not the performance of the promises, constitute consideration. *See Eli Envtl. Contractors v. 435 Partners, LLC*, 2007 WI App 119, ¶ 14, 300 Wis. 2d 712, 731 N.W.2d 354. *See also, e.g., Ferraro v. Koelsch*, 124 Wis. 2d 154, 164, 368 N.W.2d 666 (1985) ("It is black letter law that a promise for a promise, or the exchange of promises, will constitute consideration to support any contract of this bilateral nature.").

If the Option Agreement had stipulated a purchase price of zero at the beginning, Weston might have had a point. But the undisputed testimony from Ms. Nevo-Hacohen shows that the Purchase Price could and would have been higher if the businesses were more successful. (Transcript at 82:24-25, 83:1-7.) "The slightest consideration is sufficient to support the most onerous obligation; *the inadequacy, as has been well said, is for the parties to consider at the*

6

*time of making the agreement, and not for the court when it is sought to be enforced.*" *Rust v. Fitzhugh*, 132 Wis. 549, 112 N.W. 508, 511 (Wis. 1907) (citation omitted) (emphasis added).

The analysis in *Rust* is helpful to prove the point. In that case, one party to the contract promised to pay the other a sum of money calculated by mathematical formula: one-fourth (1/4) of the net proceeds derived from a sale of land. 112 N.W. at 509. "Net proceeds" was specifically defined to account for things such as taxes and "expenses connected with the care and sale of same." *Id.* The Supreme Court noted the uncertainty of how much money would be paid, but still found consideration at the time of making the agreement.

> The contract here clearly contemplated the probable happening of events which would make the amount of money payable to Rust ascertainable to a mathematical certainty. . . .
>
> The sum of money that might in the end come out of the speculation was, when the contract was made, involved in much uncertainty. The time when there would be profits for division was involved in like uncertainty. . . . While large profits may have seemed probable, it could not have been regarded but that the result might be otherwise, especially in case of the value of the services required to market the land and collect the proceeds being charged up to the deal. *There were many possible circumstances liable to materially affect the final result, making the same very profitable to the parties concerned or not so. It was not impossible that the value of the land might go down instead of up, or be largely absorbed by high taxes or other matters.*

*Id.* at 511, 512 (finding that consideration existed) (emphasis added).

Here too, Weston agreed to the Purchase Price formula, and the uncertainty associated with that. Weston knew well that the Purchase Price could be high, low, or nothing at all. The agreement to exchange Weston's assets for the mathematically-defined Purchase Price constituted valuable consideration at the time the contract was made. Like the Supreme Court in *Rust*, this Court should not second-guess the parties' agreement.

## IV.  EVIDENCE OF SETTLEMENT NEGOTIATIONS SHOULD BE EXCLUDED.

Weston argued repeatedly that it was not seeking to admit evidence of settlement negotiations in an attempt to prove (or disprove) the value of the Option, but the arguments are belied by Weston's Reply Brief and counsel's arguments at the estimation hearing.  At pages 9 and 10 of its Reply Brief, Weston argues that Sabra's "honest valuation of its Option rights was far lower than it now disingenuously seeks from the Court.  Sabra independently valued its option at between $2 and $3 million. . . . And even [if] that value was not actually the value of the Option Agreement to Sabra, it was the value Sabra thought it could extort from Weston's owners . . . ."  Similarly, during oral argument on this issue, counsel for Weston stated the real reason for trying to admit evidence from settlement negotiations:

> MR. PITZ:  Your Honor, this relates to the proper measure of damages in this case.  The measure of damages is not the value of the facility to the people that are operating it minus the amount that would have to be paid for it.  The damages in this case are the value of the facility to Sabra, who would have to come in, get a new operator, work out differences with the SNF working next door as tenant, and the difference between that and what they would have had to pay for it.
>
> And if you consider Exhibit 30 in conjunction with Exhibit 31, *I think it's a very fair inference that the actual value to Sabra of taking the facility, independent of what a fully operational facility may be worth, the value to Sabra is somewhere between the $2 million that Mr. Tran pegs in his email and $3 million that they offer—*

(Transcript at 141:18-25, 142:1-7) (emphasis added).[2]

These are exactly the kind of improper inferences that Rule 408 is designed to prevent. *See, e.g., Zurich American Ins. Co. v. Watts Industries, Inc.*, 417 F.3d 682, 689 (7th Cir. 2005)

---

[2] Incidentally, Sabra demonstrated in its opening brief that the proper measure of damages for breach of an option agreement under Wisconsin law is "the difference between the contract price and the fair market value as stipulated."  *See* Sabra Opening Br. at 11 (citing *Fleischman v. Zimmerman*, 258 Wis. 194, 199, 45 N.W.2d 616 (Wis. 1951) and other authorities).  There is no support for Weston's undeveloped argument that the Court must try to ascertain what the value might be in the hands of one person or another, and no relevant, admissible testimony at the estimation hearing shows that the fair market value of Weston's assets is anything but $13 million, as stipulated.

8

MIL-28505616-4

("By its terms, the rule forbids admission of evidence only when it is offered to prove 'liability for or invalidity of the claim or its amount.'"). And as Sabra demonstrated in its Objection to Debtors' exhibits, the Rule extends to internal memos and correspondence, not just communications made externally.

None of the information Weston sought to introduce as evidence through Debtor exhibits 29-36 is admissible or relevant. Both the exhibits and the testimony therefrom should be excluded for the following reasons:

- Exhibit 29 and testimony therefrom is being used to show that Sabra viewed the Option as having value or leverage in settlement negotiations (Transcript at 129-32);

- Exhibit 30 and testimony therefrom is being used to suggest that Sabra viewed the Option as having a value of only $2 million in settlement negotiations (Transcript at 132-33, 137-139);

- Exhibit 31 and testimony therefrom is being used to show that Sabra made an offer of settlement by which the Option could be purchased for $3 million (Transcript at 143-45);

- Exhibit 32 and testimony therefrom show a discussion that outlines the terms of a potential settlement (Transcript at 146-51);

- Exhibit 33 and testimony therefrom show a discussion of potential settlement terms (Transcript at 156-60);

- Exhibit 34 is wholly irrelevant because, as Ms. Nevo-Hacohen's testimony revealed, it does not even address this particular project, "Weston I" (Transcript at 160-61);

- Same for Exhibit 35; the testimony left it unclear whether this e-mail addressed "Weston II" (a different project) or "Weston I" (this project) (Transcript at 163); and

- Finally, Exhibit 36 is related to Exhibit 30, and is being used for the same purpose as Exhibit 30 (Transcript at 168).

Even if the foregoing exhibits and related testimony are not excluded by Rule 408, they are irrelevant to a determination of the damages actually incurred by Sabra following exercise of the Option.

At the estimation hearing, Weston cited *Zurich American* for the proposition that the e-mails and letters discussed above should not be excluded because they were sent before Sabra

9

had exercised the Option, and before a dispute had evolved. But the facts there were different from the situation here. In *Zurich*, the Court of Appeals admitted the evidence because the offer of compromise was written to settle a different action—a California insurance coverage case; the action before the Court of Appeals was an Illinois petition to compel arbitration under certain deductible agreements. *Id.* at 689-90.

Here it is wholly unpersuasive to distinguish between a settlement communication that involved only the Option Agreement, or one that involved the Loan Documents and the Option Agreement. The settlement negotiations, as the evidence makes clear, were global in nature. (Transcript at 132:11-25, 133:1-13; 138:24-25, 139:1-4; 158:3-9; 161:4-10; 163:8-11.) Why should Weston's proffers to disprove the value of the Option with settlement communications be any more admissible when a global settlement was being discussed, than they would be if an Option-only settlement were being discussed? Indeed, given the outstanding loan balance, it was unlikely that the parties would have ever engaged in settlement discussions on the Option alone.

**V.    THE PARTIES STIPULATED THAT THE VALUE OF WESTON'S PROPERTY WAS $13 MILLION, AND THAT STIPULATION SHOULD CONTROL.**

In their last brief, Debtors concede that the appropriate measure of damages for breach of an option agreement is the difference between the purchase price and the value of the property, but suggest that because the $13 million stipulated number includes more than just improved real estate, Sabra's damages must be less than $13 million. This undeveloped argument fails for each of several reasons.

First, Debtors cite no authority for this proposition. The parties stipulated to the value of Weston's assets "for purposes of today's hearing," and that stipulation should control. (Transcript at 12:15-20, 13:19-23.) The Court should not permit Weston to retreat from its stipulation as to value, particularly when Sabra relied on that stipulation in preparation for the

10

hearing by not calling a valuation expert to testify about the value of Weston's assets. Second, even if Weston had been able to prove that the value of intangible assets cannot be included in Sabra's calculation of damages, at most it would reduce the damages to $12,781,200, which is the stipulated value of the improved real estate as further reflected in Weston's Schedules of Assets and Liabilities and the 2015 and 2016 property tax bills for the Facility.[3]

Third, there is no evidence to suggest that the value of the Facility was less to Sabra than it was to Weston. Debtors have offered nothing in the way of evidence to demonstrate that common ownership of the two separate enterprises was "necessary" to successfully operate the Facility. (Transcript at 60:21-25, 61:1-10.) Nor can they persuasively claim that Sabra's value was less because it "could not obtain the licenses necessary" to operate the Facility. As the only testimony at the estimation hearing showed, Sabra did not need licenses because it was always planning to lease the Facility back to Weston. (Transcript at 61:11-18.) Lastly, Weston fails to explain why it is relevant that "the property subject to Option did not include the skilled nursing facility." (Debtors' Reply Br. at 9.) The stipulation regarding the value of Weston's assets is $13 million; that has nothing to do with Debtor FPG & LCD or its skilled nursing facility. Indeed, the skilled nursing facility is not a separate building, it is merely a leasehold encumbering a portion of the Facility.

### VI.   WESTON'S MITIGATION ARGUMENT FAILS.

In the last paragraph of its last brief, Weston argues that Sabra failed to mitigate its damages. Specifically, Weston suggests that "mitigation" would have required Sabra to set a closing date, draft a purchase agreement, and take steps to enforce its rights. This argument fails for each of at least two reasons.

---

[3] To the extent necessary, Sabra asks the Court to take judicial notice of the values reflected in Weston's Schedules and the property tax bills, which are publicly available and self-authenticating. (There is no doubt that it is the value of *improved* real estate that should be considered, not just the value of the land. The case Weston cites, *Fleischman v. Zimmerman*, makes this clear because there was a house on the lot to be sold. 258 Wis. at 195-96.)

First, the burden of proof is on Weston to establish that Sabra failed to do all that was reasonable to minimize damages *subsequent to the breach*. *See, e.g., Sprecher v. Weston's Bar, Inc.*, 78 Wis. 2d 26, 42, 253 N.W.2d 493, 500 (Wis. 1977). Here, Weston did not technically breach until it failed to close (and failed to provide all of the due diligence information and other materials it would have needed to close), so Sabra could not have tried to mitigate damages until that point in time. Second, how would Sabra's damages have been reduced by taking the action Weston now proposes? The only evidence available, and all logical inferences therefrom, shows that Weston did not want to, and could not, close. (Transcript at 92-95, 125, 123:23-25.) Weston cannot show that by setting a closing date, drafting a purchase agreement, or taking any other steps, Sabra's damages would have been reduced in the slightest. In fact, such action would have only increased Sabra's expenses.

## **CONCLUSION**

For all of these reasons, and those set forth in Sabra's prior briefs and at oral argument, the Court must overrule Debtors' objections to the Option Claim, and the Option Claim should be estimated for purposes of allowance at $13 million.

Dated this 12th day of May, 2017.

          HUSCH BLACKWELL LLP
          *Attorneys for Sabra Phoenix Wisconsin, LLC*

          By:   /s/ *Frank W. DiCastri*
                Frank W. DiCastri
                Lindsey M. Greenawald
                HUSCH BLACKWELL LLP
                555 E. Wells Street, Suite 1900
                Milwaukee, WI 53202
                Telephone: (414) 273-2100
                Email: frank.dicastri@huschblackwell.com
                          lindsey.greenawald@huschblackwell.com

MIL-28505616-4