UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

In re:

FIRST PHOENIX-WESTON, LLC,
and FPG & LCD, L.L.C.,

Case No. 16-12820-cjf-11
Jointly Administered with
Case No. 16-12821-cjf-11

Debtors.

## MEMORANDUM DECISION

This is a tale of two views of the same transaction. Debtor First Phoenix-Weston, LLC ("Weston") borrowed $14,694,599.73 from Sabra Phoenix TRS Venture, LLC ("Sabra Phoenix") in November of 2013. The transaction was documented by a Loan Agreement, Note, and Mortgage. In addition, an Option Agreement was executed the same day between Weston and Sabra Phoenix. The Loan Agreement and related documents—including the Option Agreement—were assigned to Sabra Phoenix Wisconsin, LLC ("Sabra") by Sabra Phoenix.

On August 15, 2016, Weston and Co-Debtor FPG & LCD, L.L.C. ("FPG") (collectively the "Debtors"), filed voluntary Chapter 11 petitions. On December 21, 2016, the Debtors' largest pre-petition lender, Sabra, filed Proof of Claim No. 16 in the Weston case. The claim was in an amount "not less than" $17,773,438.77.[1] The Proof of Claim contains an addendum detailing the calculation of the stated amount and, further, asserts "an unliquidated,

---

[1] The parties agree this is the total owed under the Note and that it is an undersecured, secured claim. They have agreed that the secured portion of the claim is in the amount of $13 million.

unsecured amount as damages for Debtors' pre-petition breach of the Option

Agreement."

The Debtors objected to Sabra's Proof of Claim No. 16 ("Claim

Objection"). The objection focuses on the claim for additional sums related to

the Option.[2]

Sabra moved "for Entry of Orders: (I) Estimating Claim for Breach of

Option Agreement; and (II), to the Extent Necessary, Temporarily Allowing

Sabra's Claims for Voting Purposes" (the "Option Motion"). Weston filed a

limited objection to Sabra's Option Motion contending that Sabra does not have

a claim under the Option Agreement. An evidentiary hearing on the Claim

Objection and the Option Motion was conducted. After that hearing, the parties

made closing arguments, submitted post-hearing briefs, and the Court took the

matter under advisement.

For the reasons stated below, the Court denies the Option Motion and

grants the Claim Objection with respect to the unliquidated claim for breach of

the Option Agreement.

## RELEVANT BACKGROUND

The Debtors operate an assisted living and a skilled nursing facility (the

"Facility") in Weston, Wisconsin.[3] Construction of the Facility began in March

2012. The Debtors obtained a certificate of occupancy in February 2013.

---

[2] Whether there are counterclaims or other accounting issues that may reduce the
stated claim amount are issues that have been reserved.

[3] Weston owns the real property and operates the assisted living ("ALF") portion of the
building. FPG leases a portion of the building and operates the skilled nursing ("SNF")

In August 2012, Sabra Health Care REIT, Inc. ("REIT"), Sabra's corporate parent, and First Phoenix Group, LLC ("FP Group"), one of Weston's original members,[4] executed a writing outlining circumstances that might result in potential business relationships between the parent companies. This writing was called a Pipeline Agreement (the "Pipeline Agreement").

FP Group was developing senior housing facilities in the Upper Midwest primarily in Wisconsin and Minnesota. REIT concentrates on health care real estate focusing primarily on senior housing and skilled nursing facilities. REIT does not operate any facilities and it typically looks to others to develop the facilities. The Pipeline Agreement set a framework for possible transactions. It provided the opportunity for FP Group to bring a project to REIT for approval or preapproval. If approved, REIT could—but was not required to—provide pre-development financing to assist FP Group with certain pre-construction financing expenses. After completion of construction, FP Group could approach REIT requesting short-term mortgage financing to refinance any construction mortgage. Any such mortgage was intended to remain in place no more than three years.

The Pipeline Agreement also required an option agreement with respect to any "Approved Facility." Section 4.5 of the Pipeline Agreement contemplated that for each Approved Facility, FP Group would grant REIT an option to

---

portion of the business. The parties share certain employees and allocate various expenses on a percentage basis.

[4] FP Group sold its interests in Weston and FPG in 2016.

3

purchase the applicable Approved Facility. In addition, REIT was to grant

FP Group an option to "Put" the applicable Approved Facility.

Following completion of construction, refinancing of the construction

loan was sought. Weston refinanced the Facility through a loan from Sabra

Phoenix.[5] The loan was evidenced by a Loan Agreement ("Loan Agreement"),

Note, Allonge, Mortgage, and various modifications to or assignments of those

documents (collectively, the "Loan"). Simultaneously, Weston and Sabra

Phoenix executed an Option Agreement.

The need for money to pay off the construction loan was the golden

thread that united Weston and Sabra. The Loan and Option were inextricably

intertwined. The Option Agreement was a condition precedent to the Loan.

Absent the Option there would have been no Loan, and absent the Loan there

would have been no Option. At the moment the documents were signed, the

Purchase Price was virtually zero and the calculation never materially changed

in any way beneficial to Weston. The Loan Agreement and Option Agreement

were signed concurrently.

The Option Agreement is, according to Sabra, a two-sided coin—separate

from (though related to) the Loan. It granted Sabra an option to purchase at a

price calculated based on EBITDAR minus estimated management fees of 5% of

gross and further reduced by an adjustment factor and by an estimated initial

lease rate of 7.75% for the Assisted Living Facility ("ALF") and 9% for the

---

[5] The Loan was later assigned by Sabra Phoenix to Sabra.

4

Skilled Nursing Facility ("SNF") during the "Call Option Period." The Call Option

Period ran from the date of "Stabilization" and expired sixty (60) days following

the "Outside Stabilization Date."[6] The Facility never achieved the occupancy

target. Thus, the Call Option Period was to expire on May 6, 2015.

The other side of the coin was a Put Option (the "Put" or "Put Option").

Under the Put Option Weston had the opportunity to provide notice to Sabra of

its intention to sell to Sabra. Under such notice, and subject to certain

conditions, Sabra would have been required to purchase. However, this notice

could not be given until Stabilization occurred and it expired at the end of the

Put Option Period.

Stabilization never occurred. The Put Option Period and the Call Option

Period were to expire simultaneously on May 6, 2015. However, the parties

amended the Option Agreement on May 5, 2015.[7] Relevant here, the May 5,

2015 amendment ("Second Amendment") extended Sabra's Call Option Period

to the Loan Maturity Date. The Amendment did not extend the Put.

Simultaneously, the parties modified the Loan Agreement to amend the

definition of Maturity Date as follows:

> The Maturity Date with respect to the Loan shall be the earlier to
> occur of: (i) in the event that Sabra (or its Affiliate) elects to
> purchase the Facility pursuant to the Option Agreement, the
> Purchase Closing Date for the Facility, or (ii) any earlier date on
> which the Loan shall be required to be paid in full, whether by

---

[6] "Stabilization" occurs when (1) the Facility achieved 90% occupancy for three
consecutive months, or (2) the Outside Stabilization Date of March 7, 2015.

[7] A first amendment was executed. Its purpose was simply to confirm that Sabra was
the successor in interest to Sabra Phoenix and to make revisions to the legal
description.

acceleration or otherwise, or Borrower elects to prepay the Loan in
full pursuant to Section 3.6(d). Notwithstanding the foregoing, the
Maturity Date for the Loan, including, without limitation, under
the circumstances described under clause (i) above, shall in no
event be later than the date that is thirty-six (36) months after the
Closing Date.

On January 6, 2016, Sabra sent written notice to FP Group stating its
intent to exercise its Call Option under the Option Agreement dated November
7, 2013, as amended. Thus, under the Third Modification, the Loan was to
mature on the Purchase Closing Date for the Facility.

Weston disputes whether Sabra's January 6, 2016 letter comports with
the Option Agreement's "post-notice procedures and deadline for closing." It
argues that under the Option Agreement, as amended, Sabra had a duty to
close the purchase of the Property before June 26, 2016. Weston maintains
that through an email sent by FP Group dated January 22, 2016, it complied
with all applicable closing requirements by furnishing Sabra with a calculation
of the Property's purchase price.

On February 11, 2016, Sabra sent another letter to FP Group confirming
a purchase price for the Facility as zero, and set a closing date of March 28,
2016. Following the February 11, 2016 letter, FP Group executed its right to
extend the last day for closing to June 26, 2016. Neither Sabra nor Weston
initiated a closing at any time on or before June 26, 2016. Sabra asserts the
onus was on Weston to complete closing, and Weston contends the onus was
on Sabra. Weston filed its Chapter 11 on August 15, 2016.

Per Sabra's February 11, 2016 letter, it approved the Debtors' calculation
of the ALF amount and the SNF amount pursuant to the exercise of Sabra's

6

Call Option under the Option Agreement. Sabra agreed that the Purchase Price

for the Facility was "zero," "as the sum of the ALF Amount and the SNF amount

was ($4,943,356)." FP Group was required to fund into escrow "any shortfall

between the Loan Payoff Amount and the Purchase Price" at closing. Sabra

defined the Loan Payoff Amount to be $16,079,104. With the Purchase Price at

zero, FP Group was to deposit $16,079,104 into escrow.

## DISCUSSION

For the reasons set forth herein, Sabra is not entitled to an additional

claim for Weston's alleged breach of the Option Agreement. In reaching this

conclusion, the Court finds the Option Agreement was inextricably linked to

the Loan Agreement and served merely as additional security for the Loan

transaction. The Court further finds a lack of consideration for the Second

Amendment, that the Option was unconscionable, and that the Option

impermissibly clogged Weston's right of redemption. Contrary to Weston's

theory of the case, the Option did not expire upon Sabra's failure to set a

closing time. Regardless, as a result of the Court's findings, Sabra is not

entitled to damages under the Option.

### Single Transaction

To estimate Sabra's claim for Weston's alleged breach of the Option

Agreement, the Court is required to consider the fundamentals of contract law.

Was this a single transaction or were there two transactions—a loan and a

separate, independent option? This is relevant because it also raises the issue

of whether the Option Agreement between the parties is unenforceable due to a lack of independent consideration.

Weston argues the issue is controlled by the Wisconsin Supreme Court's decision in *Barr v. Granahan*, 255 Wis. 192, 38 N.W.2d 705 (Wis. 1949). Sabra asserts *Barr* is distinguishable from the case at hand for four reasons: (1) the court in *Barr* addressed a traditional loan and mortgage with an attached option agreement while the present transaction between the parties contemplated a sale/leaseback relationship; (2) the Purchase Price was calculated using an agreed upon formula; (3) Weston's redemption rights were not "clogged" because there was no value to the Option once Sabra accelerated the Loan; and (4) Weston's ability to Put the Facility to Sabra provided independent consideration for the Option Agreement.

In *Barr*, a mortgagor executed an option agreement simultaneously with a promissory note and mortgage. *Barr*, 255 Wis. at 195. The promissory note was in the amount of $8,572. *Id.* The option agreement granted the mortgagee the ability to purchase the mortgaged property for $8,000 and ran for ten years. *Id.* In addition, the option agreement explicitly stated that the agreement was consideration for the loan. *Id.* at 196. Approximately two years after executing the above instruments, the mortgagee exercised the option. *Id.* at 195. While not clear from the facts, it appears the mortgagor refused to comply with the option agreement, and the mortgagee sued for specific performance. *See id.*

8

Like Sabra, the mortgagee in *Barr* argued the option agreement was a separate transaction from the promissory note and mortgage. *Id.* at 196. The *Barr* court refused to grant specific performance to the mortgagee, and found the option agreement provided additional security to the promissory note and mortgage. *Id.*

After quoting the longstanding axiom, "once a mortgage always a mortgage," the court concluded the option agreement served as security and reasoned that "[t]he purpose of the instrument is the controlling feature under all circumstances. If that is security and the facts of the matter are established in any action involving the subject, the instrument is treated as a mortgage and nothing else." *Id.* at 197 (quoting *Smith v. Pfluger*, 126 Wis. 253, 105 N.W. 476 (Wis. 1905)).

In the present case, to understand the purpose of the Option Agreement, the Court first looks to the rules of contract interpretation. "The primary goal in contract interpretation is to give effect to the parties' intentions." *Seitzinger v. Cmty. Health Network*, 2004 WI 28, ¶ 22, 270 Wis. 2d 1, 14, 676 N.W.2d 426, 433. The Court ascertains the parties' intentions by reviewing the language of the Loan and Option Agreements. *See State ex rel. Journal/Sentinel, Inc. v. Pleva*, 155 Wis. 2d 704, 710-11, 456 N.W.2d 359, 362 (Wis. 1990). If the contract language is ambiguous, two further rules apply: (1) extrinsic evidence may be used to determine the parties' intent, and (2) ambiguous contracts are interpreted against the interests of the drafter. *Seitzinger*, 2004 WI 28 at ¶ 22 (citation omitted). The Court will interpret the Loan Agreement and Option

9

Agreement to give effect to the parties' intent "as expressed in the contractual language." *See id.* This language is to be "interpreted consistent with what a reasonable person would understand the words to mean under the circumstances." *Id.*[8]

The Option Agreement was a condition precedent to the Loan Agreement. A condition precedent is "[a]n act or event . . . that must exist or occur before a duty to perform something promised arises." *Black's Law Dictionary* (10th ed. 2014). The central purpose of the Option Agreement was to serve as a condition precedent as contemplated in the Loan Agreement. Had Weston refused to sign the Option Agreement, the Loan Agreement would not have been binding. *In re CS Estate Inc.*, 558 B.R. 292, 296-97 (Bankr. W.D. Wis. 2016) (quoting *Kocinski v. Home Ins. Co.*, 147 Wis. 2d 728, 433 N.W.2d 654, 658-59 (Wis. Ct. App. 1988)) ("There is a distinction (often blurred) between a condition *under a contract* (where, though there is a binding contract, performance is delayed until the condition is satisfied) and a condition *to the making of a contract* (where there is no contract until the condition is satisfied)."). The Option Agreement here represents a condition to the making of the contract since Section 3.2 of the Loan Agreement states:

**<u>Conditions Precedent to Making the Loan</u>**.

In addition to the foregoing, Lender's obligation to close the Loan is conditioned upon: (A) Sabra (or its Affiliate) and Borrower [Weston] having entered into the Option Agreement with respect to the Facility and Borrower [Weston] having consented to the recording

---

[8] The parties before the Court are subsidiaries of the two entities that created the Pipeline Agreement. This fact is taken into consideration in this analysis.

of a memorandum of the same in the official records of the county
in which the Facility is located . . . .

Consequently, the Loan Agreement was not effective until Sabra and Weston
entered into the Option Agreement. Thus, the Option Agreement was a
condition to the making of the Loan Agreement. There was no enforceable Loan
Agreement until the parties executed the Option Agreement. Under these
circumstances, despite the presence of Weston's ability to "Put" the Facility to
Sabra, the Court finds the purpose of the Option Agreement was to satisfy a
condition precedent to closing the Loan. Thus, the Option Agreement stands as
additional security for the Loan transaction.

The Option and Loan were inextricably linked and intertwined. If these
were two separate transactions, then consideration would have been required
for the Option. There was no separate payment for the Option, only the Put
feature. Even if the Put constituted consideration, it is not material to the issue
before the Court because the original option term expired without exercise and
the Put expired.

### Second Amendment Consideration

As noted, even if the Court finds the Put Option provided consideration
for the Option Agreement and there were two separate transactions, it expired
on May 5, 2015. Weston and Sabra amended the Option Agreement on May 5,
2015 to extend Sabra's Call Option, but they did not extend Weston's Put
Option. Weston never achieved Stabilization. Thus, Weston could not exercise
its Put Option.

11

In *Bratt v. Peterson*, 31 Wis. 2d 447, 451, 143 N.W.2d 538 (Wis. 1966),

the Wisconsin Supreme Court developed the initial framework for the law

regarding options in Wisconsin:

> An option to purchase is a continuing promise or offer given by the
> landowner to sell real estate to another at a specified price within a
> specified period of time. The offer ripens into a binding and
> irrevocable "option contract" *if consideration is given,* but can be
> withdrawn any time before acceptance if not based on
> consideration. Once the "option contract" or offer is accepted, a
> contract of sale arises.

*Id.* at 451 (emphasis added). The key reasoning in *Bratt* is that if there is

consideration the option to purchase runs for a specified period of time as a

contract. If no consideration, it is not a binding and irrevocable contract but,

instead, is simply an offer.

Here, Sabra's Call Option was set to expire within a stated period of time,

namely, the Call Option Period, which expired sixty (60) days after the Outside

Stabilization Date of March 7, 2015 (in other words, May 5, 2015). On May 5,

2015, the parties amended the Option Agreement to extend Sabra's Call Option

by linking it to the Loan Agreement's maturity date. Sabra contends the Second

Amendment was supported by consideration because it gave Weston more time

to improve the Facility's performance. Weston argues the Second Amendment

"conferred no legal benefit" upon it. Instead, the Second Amendment extended

Sabra's sole discretion to exercise its Call Option. Weston asserts the

"additional time" to improve the Facility is ephemeral since it rested upon

Sabra's sole discretion on whether or not to exercise its Call Option or to

declare maturity on the Note. The opportunity to improve the operations of the

12

Facility and thus potentially increase the Purchase Price from zero was, at best, fleeting and of no real monetary value. In fact, as Weston highlights, Sabra could have exercised the Call Option on the same day the Second Amendment was signed. The Court agrees.

Consideration may be either a benefit to the promisor or a detriment to the promisee. *McLellan v. Charly*, 2008 WI App 126, ¶ 27, 313 Wis. 2d 623, 758 N.W.2d 94. In both cases, the parties must bargain for the benefit or the detriment. *Id.* Although courts are reluctant to enter the fray of what constitutes consideration, in the context of damages courts are more willing to interfere with the terms of a bargained-for agreement. *Woodbridge Place Apartments v. Washington Square Capital, Inc.*, 965 F.2d 1429, 1436 (7th Cir. 1992). The present case warrants such examination.

"[W]hile a promise may constitute sufficient consideration for a return promise . . . , it is not sufficient if [the promisor's] performance depends solely upon his option or discretion, as where the promisor is free to perform or to withdraw from the agreement at will." *First Wis. Nat'l Bank v. Oby* 52 Wis. 2d 1, 7, 188 N.W.2d 454 (Wis. 1971).

Sabra contends consideration at the Second Amendment stage mattered only if Weston sought to revoke its continued offer to sell. Regardless of Weston's desire to revoke the Option, Sabra's Call Option was set to expire on May 5, 2015. Further, this presupposes the Option was separate and distinct from the Loan. To extend Sabra's Call Option rights beyond that date, further consideration was needed.

13

Weston also relies on *Bratt* for the suggestion that when the parties agreed to extend the Call Option Period such extension must be supported by consideration evidenced in the terms of the new agreement. *See* 31 Wis. 2d at 453. Weston reasons the Second Amendment to the Option Agreement lacks consideration because, in the absence of its extension, the Put Option forms no part of the consideration for the extension. Sabra argues the parties changed the Call Option Period to a period that began on the Outside Stabilization Date of March 7, 2015, and ended on the Maturity Date of the Loan Agreement to afford Weston additional time to achieve Stabilization. This did not confer any real benefit on Weston because it had no control over the period. The promise of additional time was solely at the option and discretion of Sabra.

"[C]ourts are generally reluctant to interfere with bargained-for agreements between parties." *Woodbridge Place Apartments*, 965 F.2d at 1435. The Court may determine the sufficiency of consideration in the context of damages. *See id.* at 1436. Reviewing the Second Amendment, Weston had no ability to delay or prevent Sabra from exercising its Option. Accordingly, Weston's extension of time to achieve Stabilization was linked directly to Sabra's choice to not exercise its Call Option. Under these circumstances, the Court finds consideration lacking for the Second Amendment.

### Consideration for Sale Contract

Sabra contends that, once exercised, the Option Agreement matured into a binding real estate contract which replaced the Option Agreement. Weston disagrees and argues that under Wisconsin law an option agreement creates

14

two separate contracts: (1) an agreement not to withdraw a continuing offer to sell; and (2) an agreement to purchase the subject property once the optionee exercises the option. Weston contends under *Bratt* and *McLellan* that both contracts must be supported by consideration.

The court in *McLellan* expanded the option framework first developed by the Supreme Court in *Bratt* by concluding that "the consideration required for a binding option contract must be separate from the consideration for the sale of the property." *McLellan*, 2008 WI App 126 at ¶ 19.

Sabra argues valuable consideration is present because once it exercised the Option, Weston promised to sell the Property for an ascertainable price and Sabra agreed to buy it.[9] Sabra cites *St. Norbert College Foundation, Inc. v. McCormick*, 81 Wis. 2d 423, 260 N.W.2d 776 (Wis. 1978), for the premise that even an indeterminate value constitutes consideration. *Id.* at 430-31. According to Sabra, under *St. Norbert* valuable consideration was given because the parties calculated the Purchase Price, set a closing date, and Weston extended the closing date by 90 days. However, these actions appear to be akin to the parties fulfilling their duties under the Option and Loan Agreements rather than a benefit or a detriment of consideration.

In terms of consideration, "[t]he law concerns itself only with the existence of legal consideration because '[t]he adequacy in fact, as distinguished from value in law, is for the parties to judge for themselves.'" *Id.*

---

[9] The "ascertainable price" was zero.

at 430 (citation omitted). However, in the context of damages, under *Wood-bridge Apartments* the Court may examine consideration.

In *St. Norbert,* the defendant informed the president of St. Norbert College that he intended to gift a total of $1,500,000 to the College in two separate stock transfers to be made in accordance with a trust and two buy-sell agreements. *Id.* at 430. The first stock transfer of $1,000,000 was not at issue. Regarding the $500,000 gift, the defendant established a trust and executed a second buy-sell agreement. *Id.* According to the second buy-sell agreement, the defendant agreed to sell to St. Norbert College 7,000 shares of Proctor & Gamble in exchange for the College paying to the defendant $5,000 annually for life. *Id.* The defendant refused to comply with the terms of the second buy-sell agreement and the College filed suit against the defendant for failing to transfer the 7,000 shares. *Id.* The defendant argued the buy-sell agreement was unenforceable for lack of consideration. The court found the presence of consideration was clear from the document. "Defendant agreed to sell the stock. [St. Norbert] agreed to pay the stipulated price -- $5,000 per year for life to the defendant." *Id.*

Sabra maintains *St. Norbert* stands for the proposition that consideration existed not because any payments were made but because the parties had promised to buy and sell the Facility on a future date. Indeed, the second buy-sell agreement in *St. Norbert* was to take place approximately six years after the defendant executed the documents. *Id.* at 430.

16

However, *St. Norbert* is distinguishable from the present case because the contract at issue is an option to purchase real property. As described in *Bratt*, an option to purchase is a continuing promise to sell. 31 Wis. 2d at 451. This offer matures into a binding "option contract" if consideration is given. *Id.* The Wisconsin Court of Appeals in *McLellan* extended the Wisconsin Supreme Court's holding in *Bratt* by concluding there must be separate consideration for the option contract and the contract of sale. *McLellan,* 2008 WI App 126 at ¶ 25. Otherwise, "if the consideration required to make an option a binding and irrevocable option contract could be found in the terms negotiated for the purchase, then every option would be binding and irrevocable because there would always be, by definition, at least a purchase price included in the option." *Id.* at ¶ 23.

Here, the Option Agreement recites that it is made "in consideration of the mutual covenants, agreements and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged." Similarly, the statement of consideration in the Second Amendment provides that "for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sabra and [Weston] agree as follows . . . ." Weston argues that these statements create a rebuttable presumption that adequate consideration exists for both the Option Agreement and the Second Amendment. *See Jax v. Jax*, 73 Wis. 2d 572, 586, 243 N.W.2d 831 (Wis. 1976) (holding a negotiable instrument carries with it a presumption of valid consideration, which may be rebutted with clear and convincing

17

evidence to the contrary). At bedrock, consideration must be "'something of real value in the eye of the law, whether or not the consideration is adequate to the promise is generally immaterial.'" *Rust v. Fitzhugh,* 132 Wis. 549, 557-58, 112 N.W. 508 (Wis. 1907).

Outside of the loan transaction, Weston contends no meaningful consideration for the Option Agreement exists. Even if the Put Option provides consideration for the Option Agreement, under *McLellan* Weston posits the Put Option would not establish consideration for any sale contract that arose when Sabra allegedly exercised the Option. Weston argues there was no consideration for the sale of the Property because the Purchase Price as calculated under the Option Agreement was zero.

Conversely, Sabra argues the Option Agreement used a formula to calculate the Purchase Price for the Facility. Sabra relies on *Rust v. Fitzhugh* for the hypothesis that even the slightest consideration, however small, "is sufficient to support the most onerous obligation." 132 Wis. at 558.  In that case, one party agreed to pay another party a sum of money based on a mathematical formula for the purchase of real property. *Id.* at 554. The *Rust* court concluded the contract was valid despite the fact payment was based on speculation involving significant uncertainty. *Id.* at 559.

Here, the Facility's Purchase Price under Section 3(a) of the Option Agreement is calculated as follows:

> (a) The purchase price for the Property (the "Purchase Price") shall be an amount equal to the sum of the SNF Amount plus the ALF Amount.

The SNF Amount means "the quotient obtained by dividing the SNF Adjusted

EBITDAR by the SNF Initial Lease Rate." Similarly, the ALF Amount means "the

quotient obtained by dividing the ALF adjusted EBITDAR by the ALF Initial

Lease Rate." As noted, Weston through an email sent by FP Group dated

January 22, 2016, calculated the SNF and ALF amounts resulting in a negative

Purchase Price of ($4,943,356). The Option Agreement calculated the Facility's

Purchase Price based on an EBITDAR and Lease Rate formula. Weston agreed

to this calculation despite the fact the Purchase Price was based on the risks

that the SNF and ALF operated successfully. Putting aside the Second

Amendment and the Court's finding that the Loan Agreement and Option

Agreement consisted of a single transaction, the Court finds the Option

Agreement's calculation of the Purchase Price did not constitute sufficient

consideration. There was no Stabilization or any amount paid or payable for

the purchase on the date of the Loan and Option Agreement. The "Purchase

Price" would have been zero on those dates and that never changed. There was

not even a scintilla of consideration. The Purchase Price was a negative amount

and, even if some additional time had reduced that amount, in light of the one-

sided control of timing for exercise, there was no value.

### **Right of Redemption**

Weston claims the Option Agreement is invalid under *Barr v. Granahan*

because the Option "clogs" its right of redemption. Sabra responds the Option

Agreement does not clog Weston's redemption rights "because there was 'no

value to the option once [Sabra] accelerated the loan.'" Further, Sabra asserts

19

the Option Agreement preserves Weston's right of redemption because it expired on the Loan Agreement's Maturity Date. Thus, Sabra was unable to exercise the Option upon Weston's default.

Governed by state law, "[t]he right of redemption is an inherent and essential characteristic of every mortgage." *Barr*, 255 Wis. at 195; *see also Farm Credit Bank of Saint Paul v. Lord*, 162 Wis. 2d 226, 236, 470 N.W.2d 265 (Wis. 1991). In general terms, the right of redemption is a right conferred to a mortgagor "to redeem the property by repaying the debt at any time until the foreclosure has been completed." Marshall E. Tracht, *Renegotiation and Secured Credit: Explaining the Equity of Redemption*, 52 Vand. L. Rev. 599, 606 (1999).

 "For centuries it has been the rule that a mortgagor's equity of redemption cannot be clogged and that he cannot, as a part of the original mortgage transaction, cut off or surrender his right to redeem. Any agreement which does so is void and unenforceable [sic] as against public policy." *Humble Oil & Refining Co. v. Doerr*, 123 N.J. Super. 530, 544, 303 A.2d 898 (1973). A restraint on the right of redemption "denotes 'any provision inserted to prevent a redemption on payment or performance of the debt or obligation for which the security was given.'" *Blackwell Ford, Inc. v. Calhoun*, 219 Mich. App. 203, 208, 555 N.W.2d 856 (1996). Further, "[a]ny agreement in or created contemporaneously with a mortgage that impairs the mortgagor's right . . . [to redeem] is ineffective." *Restatement (Third) of Property: Mortgages* § 3.1(b) (3rd 1997). *Restatement (Third) of Property: Mortgages* further provides "[a]n

20

agreement in or created contemporaneously with a mortgage that confers on

the mortgagee an interest in mortgagor's real estate does not violate this

section unless its effectiveness is expressly dependent on mortgagor default."

*Id.* at § 3.1(c).

Wisconsin has codified three statutory rights of redemption. Wis. Stat.

§§ 846.103, 846.13, and 846.30. The first of these, Wis. Stat. § 846.103(1),

addresses foreclosures on commercial properties and multifamily residences.

*Bank of N.Y. Mellon v. Carson*, 2015 WI 15, ¶ 24, 361 Wis. 2d 23, 859 N.W.2d

422. It contemplates a six-month redemption period once a judgment of

foreclosure has been entered against the mortgagor. Likewise, Wis. Stat.

§ 846.13, which governs single family foreclosures, also provides mortgagors

with an opportunity post-foreclosure judgment to redeem the property "at any

time before the sale . . . ." Wis. Stat. § 846.13. Finally, Wis. Stat. § 846.30

provides that if the court finds a purchaser under a land contract has failed to

make the required payments, and the vendor is entitled to a judgment, the

court shall set a redemption period of at least 7 days from the date of the

judgment. Wis. Stat. § 846.30. Read together, these statutes evidence

Wisconsin's efforts to preserve a mortgagor's right of redemption.

As explained by the Wisconsin Supreme Court in *Barr*, in the absence of

a statutory provision to the contrary, "any contract by which the mortgagor

sells or conveys his interest to the mortgagee is viewed suspiciously . . . in a

court of equity." *Barr*, 255 Wis. at 196. Here, the Option Agreement (provided

the Second Amendment is supported by consideration) represents a contract by

which Weston has conveyed its right of redemption to Sabra. *See id.* at 196.

Under such circumstances, a court of equity examines the conveyance to

ensure it is "fair, frank, honest, and without fraud, misconduct, undue

influence, oppression, or unconscionable advantage of the poverty, distress, or

fears of the mortgagor, and of the position of the mortgagee." *Id.*

Sabra argues that since it is not seeking foreclosure or specific

performance, Weston's right of redemption is not implicated. In addition, Sabra

explains that the Option Agreement was crafted in such a way that in the event

Sabra foreclosed on the Property, the Call Option Period would have

terminated. In that case, Sabra would have been barred from exercising its Call

Option before Weston could redeem the property. Sabra contends termination

of the Call Option upon foreclosure obviates a scenario where a borrower's

right to redeem its property in the event of a foreclosure is "clogged" when the

lender exercises the option to purchase before the borrower can redeem the

property.

Further, Sabra maintains that it exercised the Option before the Loan

matured by acceleration. The Third Modification altered the Loan Agreement's

Maturity Date, which reads in relevant part:

> The Maturity Date with respect to the Loan shall be the earlier to
> occur of: (i) in the event that Sabra (or its Affiliate) elects to
> purchase the Facility pursuant to the Option Agreement, the
> Purchase Closing Date for the Facility.

A plain reading of this provision confirms that exercise of the Option was just

another means of triggering the loan maturity on June 26, 2016. Despite this

modification, Sabra argues the Maturity Date is not necessarily the date the

loan is paid in full. However, the Third Modification tied the Maturity Date to the Purchase Closing Date upon Sabra's exercise of its Call Option. This means that once Sabra exercised its Call rights, the Loan matured on the Purchase Closing Date, effectively "clogging" Weston's ability to purchase the Facility without infringing upon Sabra's Call rights. Thus, the Court also finds that by linking the Loan Agreement's Maturity Date with the Call Option, the Option Agreement impermissibly clogged Weston's right of redemption.

### **Unconscionability**

The concept of unconscionability has deep roots in both law and equity but was developed primarily in equity. Joseph M. Perillo, *Corbin on Contracts* § 29.2 (rev. ed. 2002); *Wis. Auto Title Loans, Inc. v. Jones*, 2006 WI 53, ¶ 29 n.16, 290 Wis. 2d 514, 714 N.W.2d 155. A contract provision is invalid if it is unconscionable. *See, e.g.*, 8 Richard A. Lord, *Williston on Contracts* § 18:13, at 87-88 (4th ed. 1998); John E. Murray, Jr., *Unconscionability: Unconscionability,* 31 U. Pitt. L. Rev. 1 (1969); *Restatement (Second) of Contracts* § 208 (1979) (a court may refuse to enforce an unconscionable term or contract).

In Wisconsin, contract unconscionability has been codified in Wis. Stat. § 402.302, which states that under the Wisconsin U.C.C., "[i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract . . . ."

The Wisconsin Supreme Court has defined unconscionability as "an absence of meaningful choice on the part of one of the parties together with

contract terms which are unreasonably favorable to the other party." *Discount
Fabric House, Inc. v. Wis. Tel. Co.*, 117 Wis. 2d 587, 601, 345 N.W.2d 417 (Wis.
1984).

The party claiming a contract is unconscionable has the burden to prove
facts sufficient to support that contention. *Wassenaar v. Panos*, 111 Wis. 2d
518, 526, 331 N.W.2d 357 (Wis. 1983). In determining whether a contract is
unconscionable, a court must weigh procedural and substantive factors on a
case-by-case basis. *Wis. Auto Title Loans*, 2006 WI 53 at ¶ 29.

Whether procedural unconscionability exists requires examining factors
that bear upon the formation of the contract. "The factors to be considered
include, but are not limited to, age, education, intelligence, business acumen
and experience, relative bargaining power, who drafted the contract, whether
the terms were explained to the weaker party, whether alterations in the
printed terms would have been permitted by the drafting party, and whether
there were alternative providers of the subject matter of the contract." *Id.* at
¶ 34. In general, unequal bargaining power alone is not a factor that would
support a finding of procedural unconscionability. However, "*gross* inequality of
bargaining power, together with terms unreasonably favorable to the stronger
party, may . . . show that the weaker party had no meaningful choice, no real
alternative, or did not in fact assent or appear to assent to the unfair terms."
*Restatement (Second) of Contracts* § 208 (1981) (emphasis added). *See also Wis.
Auto Title Loans*, 2006 WI 53 at ¶ 43 (holding a significant disparity in
bargaining power was a factor in favor of finding procedural unconscionability).

24

"Substantive unconscionability addresses the fairness and reasonable-ness of the contract provision subject to challenge. Wisconsin courts determine whether a contract provision is substantively unconscionable on a case-by-case basis." *Id.* at ¶ 35. No single, precise definition of substantive unconscionability can be articulated. *Id.* at ¶ 36. Substantive unconscionability speaks to "whether the terms of a contract are unreasonably favorable to the more powerful party. The analysis of substantive unconscionability requires looking at the contract terms and determining whether the terms are 'commercially reasonable,' that is, whether the terms lie outside the limits of what is reasonable or acceptable." *Id.*

A contract is not unconscionable if it is found to be procedurally invalid but substantively sound. However, the scales tip in favor of unconscionability when there is a "certain quantum of procedural plus a certain quantum of substantive unconscionability." *Leasefirst v. Hartford Rexall Drugs, Inc.*, 168 Wis. 2d 83, 88-90, 483 N.W.2d 585 (Wis. Ct. App. 1992). In essence, whether a contract is unconscionable requires a mixture of both procedural and substantive unconscionability, which is analyzed on a case-by-case basis. *Wis. Auto Title Loans*, 2006 WI 53 at ¶ 33. "The more substantive unconscionability present, the less procedural unconscionability is required, and vice versa." *Id.* Finally, courts must hold an evidentiary hearing to make the necessary factual findings to support a conclusion that a clause is unconscionable. *Leasefirst*, 168 Wis. 2d at 89.

Weston contends the Option Agreement is unconscionable because it contemplates a windfall in favor of Sabra since Sabra could then recover under both the Option Agreement and the Loan. Sabra argues Weston cannot demonstrate the contract is procedurally unconscionable because both parties are commercial entities that were led by experienced professionals and advised by legal counsel. It says the parties had two separate opportunities to negotiate the Option Agreement's terms. In addition, FP Group's manager and its other member of Weston, Wanxiang, gave written consent for the Loan. Sabra also argues the Option Agreement is commercially reasonable since it was the parties' "commercially reasonable expectation that the Purchase Price would go down" if the businesses were failing. In the event of a shortfall Weston had the ability to delay closing, which it did. At the outset, however, the Purchase Price was zero since there was not Stabilization at the time of the Loan. If the "expectation (was) . . . that the Purchase Price would go down," that would mean it would still have been zero.

Reviewing the Option Agreement and taking into consideration the circumstances antecedent to its creation, the Court concludes there was an extreme imbalance of relative bargaining power. Weston urgently needed financing to repay the construction loan and there were no apparent alternative providers of financing available. On the other hand, the parties were each represented by counsel and had similar business experience. In light of the parties' relative experience and sophistication, the Court cannot conclude there

was procedural unconscionability so great in this case that it, alone, would end the inquiry.

Substantive unconscionability, however, presents a different picture. Weston completed construction and needed to pay off its construction loan. Its permanent financing then fell through and its only source for a loan was Sabra with the short-term and condition precedent of an option. Whether under the original time period or the extended call period, Weston would be obligated to repay the Loan in the amount of $16,079,105 and transfer title to property valued at $13 million. The return on investment for Sabra was $29,079,104, or, put another way, in excess of 100%. Weston had no real power and the benefits were unreasonably favorable to Sabra. A ROI in excess of 100% in approximately three years or less is the stuff that dreams are made of.

In one respect, the Option Agreement is unconscionable because the terms are unreasonably favorable to Sabra. Weston had to not only pay into escrow an amount equal to the payoff shortfall, but also turn over the building, land, and fixtures to Sabra. In effect, Sabra is capitalizing twice on the same transaction. Accordingly, the Court finds these terms commercially unreasonable.

Unconscionability requires some combination of procedural and substantive factors. Taking into consideration the foregoing, the imbalance of bargaining power both at the outset of the transaction and at the time of the Second Amendment leads to the conclusion there was some amount of procedural unconscionability. This, combined with overwhelming substantive

27

unconscionability based on the unfairness in the Option itself, the one-sided
nature of the Option terms combined with the Loan Agreement, the one-sided
terms of the Second Amendment, and the overly harsh effect on the
disadvantaged party tips the balance in favor of unconscionability. *Discount
Fabric House*, 117 Wis. 2d at 602.

### Timely Exercise of Sabra's Call Option

If the Option Agreement was at one time an enforceable contract, Weston
argues under Section 5(a) of that Agreement that Sabra's Call Option
terminated because it failed to set a date, time, and place for closing, and
allowed the June 26, 2016 closing date to come and pass without demanding a
Purchase Agreement. Sabra disputes this position, and argues the Option
Agreement does not include an automatic termination provision.

Section 5(a) of the Option Agreement provides:

> Subject to the satisfaction or waiver by Sabra of the conditions
> described in Section 4, the closing of Sabra's (or its Affiliate's)
> acquisition of the Facility shall occur within forty-five (45) days
> from final determination of the Purchase Price (said date of closing,
> the "Purchase Closing Date"). The closing shall occur pursuant to
> the terms and procedures set forth in the Purchase Agreement. If,
> during said forty-five (45) day period, the foregoing conditions have
> not been satisfied or waived by Sabra, then Sabra may elect, by
> delivery of written notice to [Weston], to not purchase the Facility,
> in which event the Call Option and Put Option shall be
> automatically terminated and of no further force or effect.

It is undisputed that Sabra did not waive the conditions set forth in Section 4.
Sabra did not deliver written notice to Weston that it intended to waive the
Section 4 conditions. Further, the Chief Investment Officer of Sabra testified
that Sabra had no intention of waiving the conditions. Consequently, the issue

28

becomes whether time was of the essence under the Option Agreement to close on the Facility, and whether failure to do so extinguished Sabra's Call Option.

It is well established in Wisconsin contract law that time is regarded as of the essence only if "it is made so by the terms of the contract or the conduct of the parties." *Haislmaier v. Zache*, 25 Wis. 2d 376, 381, 130 N.W.2d 801, 803 (Wis. 1964). In *Buntrock v. Hoffman*, 178 Wis. 5, 13, 189 N.W. 572 (Wis. 1922), the Wisconsin Supreme Court concluded that "[t]ime will not be regarded as of the essence of the contract merely because a definite time for performance is stated therein, without any further provision as to the effect of nonperformance at the time stated."

With respect to option agreements, however, the general rule is that time is ordinarily of the essence whether or not the agreement specifically provides as much. *Clear View Estates, Inc. v. Veitch*, 67 Wis. 2d 372, 378, 227 N.W.2d 84, 87 (Wis. 1975). Still, "timely performance, even if required, can be waived or time for performance extended, either expressly or impliedly by the optionor's . . . conduct." *Id.* (citation omitted). Finally, "where no definite time is fixed for performance, one party may serve notice on the other fixing a reasonable time for performance and thereby place a time limit on his own liability." *Schneider v. Warner*, 69 Wis. 2d 194, 199, 230 N.W.2d 728, 732 (Wis. 1975).

In the present case, the Option Agreement does not contain an explicit time is of the essence provision. The Pipeline Agreement does. However, the parties to that Agreement are not before the Court. In addition, the Pipeline

Agreement merely provides a "framework" for developing senior health facilities. Accordingly, the Court must infer from the conduct of the parties before it whether time was of the essence under the Option Agreement for Sabra to close on the Facility.

Sabra exercised its Call Option on January 6, 2016. On January 22, 2016, FP Group emailed Sabra the calculated Purchase Price of the Facility revealing a "Payoff Shortfall." As defined under the Option Agreement, a Payoff Shortfall permitted Weston to delay the Purchase Closing Date. On February 11, 2016, Sabra wrote to FP Group approving its calculated Purchase Price, and set a closing date of March 28, 2016. On February 22, 2016, FP Group exercised its right under Section 5(c) of the Option Agreement and delayed the Purchase Closing Date to June 26, 2016.

According to the Closing Procedures outlined in the Option Agreement, the Facility's "closing shall occur pursuant to the terms and procedures set forth in the Purchase Agreement." Concurrent with Sabra's acquisition, Sabra (or its Affiliate) and Weston (or its Affiliate) were to execute and deliver a purchase and sale agreement for the acquisition of the Facility in the form agreed upon by both parties ("Purchase Agreement"). It appears neither party drafted or circulated a proposed Purchase Agreement. On March 18, 2016, Sabra sent FP Group an initial acquisition checklist for Weston. However, there is nothing in the record that explains FP Group's or Weston's progress in completing that checklist. After June 26, 2016, it appears neither party took

affirmative actions to close or extend closing. Consequently, on July 11, 2016, Sabra sent FP Group notice that it was accelerating the Loan.

To determine whether the parties intended time to be of the essence under the Option Agreement, the Court must interpret the parties' conduct pursuant to the terms of the Option Agreement. Sabra argues Section 5(a) is permissive in that the contract would be canceled only if Sabra elected not to purchase the Facility by delivering written notice of such intent. The implication of this position is that failure to press for closing demonstrates that time was not of the essence and, by their conduct, the parties "consented" to extension. Sabra further argues that even if time was of the essence, under Wisconsin law Weston had to provide notice of rescission and failed to do so in the seven weeks prior to filing bankruptcy. It argues this inaction "granted indulgence" to Sabra in that the burden was on Weston to demand performance and give Sabra a reasonable opportunity to perform, or declare the Option Agreement rescinded. *See Guentner v. Gnagi*, 258 Wis. 383, 392, 46 N.W.2d 194, 198 (Wis. 1951).

Conversely, Weston asserts the Option Agreement's language evidences an intent for time to be of the essence. Weston argues Sabra's Call Rights expired because it was unwilling to close. Weston contends Section 5(a) requires Sabra to either: (a) waive the conditions set forth in Section 4; (b) provide written notice to Weston of its refusal to waive the conditions prior to the closing deadline; or (c) allow the 45-day period to lapse. Weston argues

31

Sabra consciously allowed the 45-day period to lapse, which effectively terminated its Call rights.

Sabra contends the Pipeline Agreement is relevant to contextual understanding of the transactions. If the "framework" matters, then the conclusion must be that time was of the essence. One party is not obligated to wait indefinitely upon the other to perform. *See Schneider*, 69 Wis. 2d at 199. FP Group exercised its right under the Option Agreement to delay closing until June 26, 2016, thereby establishing a reasonable time for performance. *See id.* Weston misinterprets Section 5(a) of the Option Agreement. If Weston did not complete the conditions outlined in Section 4 and Sabra chose not to waive those conditions, "then Sabra may *elect*, by delivery of written notice to [Weston], to not purchase the Facility" at which time the Call Option and Put Option would expire. Contrary to Weston's interpretation, Sabra's Call Option did not automatically terminate simply because it chose not to waive the conditions.

In essence, the parties selected a reasonable time for closing the transaction, which did not occur. However, delaying indefinitely is not reasonable. Sabra also had a right to pursue certain remedies under the Option Agreement. It chose not to pursue specific performance and instead to seek allowance of a monetary claim. However, as the Court concludes above, the Option Agreement was not a separate transaction. It was part of the documentation for a single transaction and served as additional security for the loan transaction.

32

## CONCLUSION

Because the parties (1) executed the Option Agreement concurrently with the Loan Agreement, (2) established the Option Agreement as a condition precedent to the Loan, (3) linked Sabra's Call Option Period with the Loan Agreement's Maturity Date, and (4) drafted a consent letter specifically explaining that the Option Agreement was additional consideration for Sabra making the Loan, the Option Agreement is additional security for the Loan. Additionally, the Option and Amendment are, if viewed separate from the Loan, unconscionable. The interpretation of the Option Agreement advanced by Sabra would impermissibly clog Weston's right of redemption.

For all the reasons stated herein, the Court denies the motion for claim estimation, determines that Sabra is not entitled to any claim for breach of contract, and grants Weston's objection to that portion of Claim No. 16 for unliquidated damages related to the Option Agreement.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

Dated:  August 14, 2017

BY THE COURT:

_____
Catherine J. Furay
U.S. Bankruptcy Judge